UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| KEVIN MILLS, an individual,<br><br>    Plaintiff/Counterclaim Defendant,<br>v.<br><br>STITCH INDUSTRIES, INC., d/b/a JOYBIRD, a Delaware Corporation<br><br><br>    Defendant/Counter-Claimant. | Case No: 2:24-cv-04939-ODW-AGR<br><br>The Hon. Otis D. Wright, II<br>The Hon. Magistrate Alicia G. Rosenberg |

### DECLARATION OF ERIK WERNER

I, Erik Werner, declare and state under penalty of perjury that:

1.   I am an employee of Stich Industries, Inc., (d/b/a Joybird) ("Joybird").

2.   I have been employed at Joybird since August 31, 2017.

3.   I am making this Declaration in my capacity as an agent and employee of Joybird.

4.   Joybird designs, manufactures, and sells furniture products.

5.   My responsibilities for Joybird include managing the logistics of Joybird photoshoots. This includes hiring freelance photographers and other support staff such as stylists, lighting technicians ("gaffers") and digital technicians ("digitechs").

1

6. I have the authority to enter into agreements with freelance photographers and other photoshoot support staff. These agreements include dates of hire and scheduling for specific photography projects, the daily rate for each project, and photograph licensing agreements.

7. Joybird hires freelance photographers to assist in capturing photographs for its furniture collections for use on its website, social media, and product advertising materials on a project-by-project basis. The projects are designated Tier 1 ("T1"), Tier 2 ("T2") Tier 3 ("T3") or Tier 4 ("T4") depending on the category of images.

8. Joybird does not license product photographs to third parties, nor does it receive revenue directly from its product photographs.

9. In 2019, Michelle Metzger ("Metzger") was an Joybird employee with the role of lead photographer. When Joybird decided to start hiring freelance photographers to assist in capturing its product photography, Metzger assisted in interviewing and training new freelance photographers to execute Joybird photography processes. Metzger suggested Joybird hire Kevin Mills, the Plaintiff in this action, for freelance work.

10. On Metzger's recommendation, Joybird hired Mr. Mills in starting on January 15, 2019 on a project-by-project basis to assist in capturing T1 photographs for use on its website, social media, and product advertising materials.

Between January 15, 2019 and November 18, 2022, Joybird continued hiring Mr. Mills on a project-by-project basis to assist in capturing T1 photographs, and Joybird also hired Mr. Mills for T2, T3, and T4 projects. Joybird believes that Mills agrees he intended Joybird use and distribute the Photographs he was hired to capture on its website, social media, and product advertising materials.

11. Metzger did not have the authority to enter into any agreements with Mr. Mills on behalf of Joybird.

12. I had the authority to enter into agreements with Mr. Mills on behalf of Joybird with respect to his daily rate and photography schedule. I authorized Mr. Mill's daily rate of ▮▮▮▮▮ for T1 Photography projects, which is the standard budget Joybird had in 2019 for T1 photography.

13. Between January 15, 2019 and November 18, 2022, Joybird paid Mr. Mills a rate of ▮▮▮▮▮ per day for T1 photography projects. Joybird paid Mr. Mills a rate of ▮▮▮▮▮ per day for T2–T4 photography projects. The daily rate accounted for the capture, delivery, use and distribution of the photographs on Joybird's websites, social media, and other product advertising materials.

14. Mr. Mills regularly discussed his daily photography rate and scheduling for Joybird photography projects with me.

15. There is no written agreement or other communications stating or suggesting that Joybird's license to use the Photographs was contingent on Mill's rate or frequency of hire.

16. Before June 2023, Mr. Mills never indicated or suggested that there were any restrictions on Joybird's right to use the Photographs on its website and promotional materials, as they were intended to be used, and I never discussed any license agreement with Mr. Mills.

17. In my conversations with Mr. Mills, Joybird never agreed to a daily rate that was contingent on a frequency of hire.

18. It is atypical for freelance photographers in the industry to be promised a regular, ongoing, weekly or monthly set volume of work.

19. The industry standard for product photographers for retail clients is that the client has the unrestricted right to use photographs taken by the photographer in the business, as they were intended, without further compensation.

20. In all communications I had with Mr. Mills referencing his rate, Mr. Mills did not even mention the idea of there being any restrictions on Joybird's use of the Photographs or suggest that Joybird would need a license from Mills to use the Photographs.

21. Exhibit A is a true and correct copy of an email exchange between Mr. Mills and me in September 2019. In the email dated September 26, 2019, Mr.

Mills asked me about increasing his rates, seeking a daily rate of ▮ for T1 projects, ▮ for T2 projects, and ▮ for T4 projects. Mr. Mills states, "Michelle reached out about my availability for T2's 10/14-24 and [I've] been balking on accepting because of the large block of time at a ▮ rate…If I were to miss out on [other client's] work, which pays between $800 and $1500 per day, because of being tied up at Joybird at ▮, I wouldn't come anywhere near meeting my financial needs for the month, particularly in these months leading up to thanksgiving and Christmas/new years recess." On September 30, 2019, I respond maintaining Joybird's set rate of ▮ for T1 photography projects and agreeing to a rate above his request for T2–T4 photography. Mr. Mills explicitly agreed to the ▮ rate for T1 photographs without a frequency contingency stating, "Im happy to continue billing T1's at ▮ if/when you need me as it is a welcome filler for me in between jobs at my normal rate." Mr. Mills did not suggest that he conditioned his rate on a frequency of hire, or that Joybird's ability to use of the photographs he captured was contingent on a frequency of hire.

22.   In the same email dated September 26, 2019, Mr. Mills states "that for T1 Photographs, the freelance photographer only "essentially follow[s] a specific angle and lighting requirements where consistency is paramount, but still ha[s] to be flexible and experienced enough to make targeted lighting adjustments and

judgements on camera quality compromises when certain corrections are more efficiently made in post."

23. On September 25, 2020, Mr. Mills texted me, "[w]ell, [I] do want to talk with you about joybird rate structures, work frequency, etc., moving forward. This ▓▓▓▓ thing is getting harder and harder for me to justify without some sort of contracted monthly minimum and/or retainer that makes sense. I'm looking to move more and more of my business toward contracts and would love to the same with Joybird, especially if we are moving toward a one week a month, T1-only model." Mr. Mills' comments concerning billing rates was devoid of any suggestion that the rates were contingent on a frequency of hire, or that Joybird's use of the photographs he captured was contingent on a frequency of hire. I did not agree to a regular or monthly frequency of hire.

24. Between January 15, 2019 and November 18, 2022 Mr. Mills was hired on a project-by-project basis to capture and deliver photographs of the specific furniture lines specifically requested by Joybird for each project. Each engagement last a few days at most.

25. Between January 15, 2019 and November 18, 2022, Mr. Mills captured and delivered 7,808 photographs to Joybird.

26. The majority of the photographs Mr. Mills captured and delivered were T1 Photographs. At least 2,000 of the photographs for which Mr. Mills received copyright registrations are T1 Photographs.

27. All original photographs were captured on Joybird equipment or instantaneously stored on hard drives owned by Joybird upon capture of the Photograph. Mr. Mills maintained only copies of the original photographs.

28. In certain instances, when Mr. Mills was hired to edit photographs, the edited photographs were delivered to Joybird via email, generally within two (2) weeks of capture.

29. Mr. Mills sent invoices to Joybird for his photography services following each project, which Joybird paid.

30. Mr. Mills a total of ▇▇▇▇▇ on a project-by-project basis over a period of four (4) years to participate with Joybird's employees to capture Photographs of Joybird's products for the purpose of Joybird using such Photographs on its website, social media and marketing materials.

31. Based on Mr. Mill's conduct at the time of delivery, Mr. Mills did not give any reason for Joybird to believe that Mr. Mills considered Joybird's use and distribution of the Photographs to be limited or conditional.

32. Through November 2022, while the Photographs were in use, Mr. Mills knew that Joybird had set photography rates based on the Tier of project and

knew that Joybird used the Photographs he captured and delivered on Joybird's website, social media, and in product advertising materials. For four years, Mr. Mills continued to accept Joybird projects without ever stating that: (i) he owned the copyrights in the photographs; (ii) Joybird's use and distribution of the photographs were contingent upon further hiring by Joybird; and/or (iii) his rate for capturing photographs was contingent upon further hiring by Joybird.

33. Through June 2023, while the Photographs were in use by Joybird, Mr. Mills continued to contact me about opportunities to be hired for Joybird photography projects without objecting to or otherwise limiting Joybird's use of the Photographs.

34. Based on Mr. Mill's conduct at the time of delivery of the Photographs, Joybird reasonably believed that, to the extent required, Mr. Mills consented to and granted permission for Joybird's unlimited use and distribution of the photographs on its websites, social media, and other product advertising materials. Mr. Mills never provided any reason to believe there was a limit or contingency attached to Joybird's permission. After all, Joybird paid Mills to help create the photographs for that very purpose.

35. In paying ▓▓▓▓ to Mr. Mills in exchange for the capture, delivery, and unlimited and nonexclusive use of the Photographs, Joybird relied, to the extent it was required, on Mr. Mills' implicit permission and incorporated the

8

Photographs on its website and in product advertising materials. Joybird expected to be able to use the Photographs through at least the entirety of each product's lifetime. Exhibit B.

36. Exhibit C is a true and correct copy of an email exchange between Mr. Mills, Harrison Alpert ("Alpert") and me in June 2023. In an email to Alpert and me dated June 19, 2023, over 6 months after Mr. Mills' last project with Joybird, Mr. Mills writes, "I'm writing to initiate a conversation regarding image licensing for Joybird's current…use of my work on its website and in marketing materials." He also states, "[a]s I have explained to Erik and Harrison in our recent discussions, I have been comfortable waiving any licensing fees for this body of work until now because Joybird has been consistent in providing me with regular predictable engagements in what I have considered a balanced long term good faith partnership that has been working for us both. Now, however, it has been many months since I've been contracted, and there is no promise of future work from Joybird." Mr. Mills continues, "for my own personal business reasons, I must revisit my licensing terms with Joybird if the company plans to continue using my images or their derivatives moving forward."

37. In an email dated June 29, 2023, Mr. Mills notified Alpert and me that July 9, 2023 is "the end date for [Joybird's] allowable usage of [his] work." We

were extremely surprised that Mr. Mills believed he could revoke Joybird's right to use the Photographs, for which Joybird had already paid Mr. Mills for his services.

38. After receiving notice of Mr. Mill's allegations of a claim for copyright infringement, Joybird decided to remove or replace all Photographs from its website, social media, and marketing materials, just to appease Mr. Mills and avoid the possibility of an unnecessary legal dispute. The replacement efforts were significant, and they included (i) hiring third party photographs to re-shoot the subject furniture, and (ii) replacing the Photographs with photographs captured before his engagement by other photographers.

39. Joybird has incurred costs in defending against Mr. Mill's claims for copyright infringement. Joybird would not have incurred these costs had he not sued Joybird for copyright infringement.

40. Joybird has incurred costs to remove and replace the photographs Mr. Mills was hired to capture and deliver from Joybird's websites, social media, and other product advertising materials. The costs to replace the photographs was at least █████. Not all of Photographs captured by Mr. Mills were used by Joybird in June 2023, and therefore Joybird did not re-shoot the Photographs not in use. Some of the Photographs were replaced with Photographs captured before 2019. Joybird would not have removed or replaced the photographs from its websites,

social media, and other advertising materials had he not sued for copyright infringement.

41. The invoices of Exhibit B are true and correct copies of such documents, and they are business records of Joybird created and maintained in the ordinary course.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on July 14, 2025

_____
Erik Werner

29281724.1