HARRINGTON, FOXX, DUBROW & CANTER, LLP
Edward W. Lukas, Jr., State Bar No. 155214
535 N. Brand Blvd., Suite 800
Glendale, CA 91203
Telephone (213) 489-3222
Facsimile (213) 623-7929
E-mail: elukas@hfdclaw.com

HARNESS, DICKEY & PIERCE, P.L.C.
Glenn E. Forbis (*Pro Hac Vice*)
J. Bradley Luchsinger (*Pro Hac Vice*)
Colette E. Verch *(Pro Hac Vice)*
5445 Corporate Drive, Suite 200
Troy, MI 48098
Tel. 248-641-1600
Fax: 248-641-0270
Email: gforbis@harnessip.com
bluchsinger@harnessip.com
cverch@harnessip.com

Attorneys for Defendant
STITCH INDUSTRIES, INC., d/b/a
JOYBIRD, a Delaware Corporation

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| KEVIN MILLS, an individual,<br><br>        Plaintiff/Counterclaim Defendant,<br><br>v.<br><br>STITCH INDUSTRIES, INC., d/b/a<br>JOYBIRD, a Delaware Corporation<br><br>        Defendant/Counter-Claimant. | Case No: 2:24-cv-04939-ODW-AGR<br>The Hon. Otis D. Wright, II<br>The Hon. Magistrate Alicia G. Rosenberg<br><br>**DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS**<br><br>Motion Hearing: August 18, 2025<br>Pretrial Conference: October 6, 2025<br>Trial: October 28, 2025 |

Pursuant to Rule 56(c), Local District Rule 56-1 through 56-4, and the Scheduling and Case Management Order (ECF No. 30), Defendant Stitch Industries, Inc. d/b/a Joybird ("Joybird") offers the following Statement of Uncontroverted Facts in support of its Motion for Summary Judgment:

| Fact | Evidence |
|---|---|
| **I. The Parties** | |
| 1. Plaintiff Kevin Mills ("Mills" or "Plaintiff") is a photographer presently residing in Flat Rock, North Carolina. | ECF. No. 1, ¶ 12 |
| 2. Stitch Industries, Inc. ("Joybird" or Defendant") is a Delaware corporation with a principal place of business in Los Angeles, California. | ECF. No. 1, ¶ 13; ECF. No. 23, ¶ 13. |
| 3. Joybird hires freelance photographers to assist in capturing photographs for its furniture collections for use on its website, social media, and product advertising materials on a project-by-project basis. The projects are designated Tier 1 ("T1"), Tier 2 ("T2") Tier 3 ("T3") or Tier 4 ("T4") depending on the category of images. | Decl. Werner, ¶ 7; Decl. Alpert, ¶ 6. |
| 4. Joybird hired Mills in starting on January 15, 2019 on a project-by-project basis to assist in capturing T1 photographs for use on its website, social media, and product advertising materials. Between January 15, 2019 and November 18, 2022, Joybird continued hiring Mills on a project-by-project basis to assist in capturing T1 photographs, and also | Decl. Metzger, ¶¶ 5, 7; Decl. Werner ¶ 10. |

| hired Mills for T2, T3, and T4 projects. | |
|---|---|
| **II. Procedural History** | |
| 5. Mills filed the present action on June 13, 2024. | ECF. No. 1. |
| 6. Joybird filed its Answer and Counterclaims on August 8, 2024. | ECF. No. 23. |
| **III. Copyright Infringement Claims** | |
| 7. Plaintiff received Copyright Registration Nos.: VA000286105, VA0002387751, VA0002387553, VA0002387766, and VA0002387552, covering 3,301 photographs (the "Photographs"). The Photographs were captured by Mills at the request of Joybird during Mill's engagement with Joybird between January 15, 2019 and November 18, 2022. The Photographs were deposited and registered on January 22, 2024. | ECF No. 1, ¶ 40, Exh. B. |
| 8. Count I of the Complaint alleges that Joybird directly infringed Mills' Photographs by using them on Joybird's website, social media, and in product advertising materials. | ECF No. 1, ¶¶, 38–45. |
| 9. Count II of the Complaint alleges that Joybird contributorily infringed Mills' copyrighted photographs because, "third parties committed direct copyright infringement by the unauthorized use of the Photographs, Joybird "was aware that such third-party use of the Photographs…was | ECF No. 1, ¶¶ 46–52. |

without a valid license and thus constituted copyright infringement," and Joybird "materially contributed to or induced the infringement of such third parties" by "providing the Photographs…to such third parties; informing such third parties that they could use the Photographs; and assisting such third parties in the creation of advertising and promotional material incorporating the Photographs."

| **IV. Implied License and Breach of Implied License** | |
|---|---|
| 10. There is no written agreement concerning ownership of the copyrights and/or permission to use the Photographs captured by Mills. | Decl. Werner, ¶ 15. |
| 11. Before June 2023, Mr. Mills never indicated or suggested that there were any restrictions on Joybird's right to use the Photographs on its website and promotional materials, as they were intended to be used. | Decl. Werner, ¶ 16; Decl. Alpert, ¶ 37. |
| 12. Joybird believes that Mills agrees he intended Joybird use and distribute the Photographs on its website, social media and product advertising materials. | Decl. Werner, ¶ 10. |
| 13. Joybird had Mills' permission to use and distribute the Photographs through July 9, 2023, at which time Mills contends he revoked such permission. | Decl. Werner, ¶ 36, Exh. C, p.          5 (highlighting added). |

| | |
|---|---|
| 14. Between January 15, 2019 and November 18, 2022 Mills was hired on a project-by-project basis to capture and deliver photographs of the specific furniture lines specifically requested by Joybird for each project. Each engagement lasted a few days at most. | Decl. Werner, ¶ 24. |
| 15. Between January 15, 2019 and November 18, 2022, Mills captured and delivered 7,808 photographs to Joybird. | Decl. Werner ¶ 25; Exh. 7 (highlighting added); Exh. 8, p. 2 (annotation added). |
| 16.  The majority of the photographs Mills captured and delivered were T1 Photographs. At least 2,000 of the photographs for which Mr. Mills received copyright registrations are T1 Photographs. | Decl. Werner, ¶ 26. |
| 17. All original photographs were captured on Joybird equipment or instantaneously stored on hard drives owned by Joybird upon capture of the Photograph. Mills maintained only copies of the original photographs. | Decl. Werner, ¶ 27. |
| 18. In certain instances, when Mills was hired to edit photographs, the edited photographs were delivered to Joybird via email, generally within | Decl. Werner, ¶ 28. |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**
2:24-cv-04939-ODW-AGR

| | |
|---|---|
| two (2) weeks of capture. | |
| 19. Mills did not always maintain his own complete records of the photographs he was hired to capture. | Decl. Werner, Exh. C, p. 1 (highlighting added). |
| 20. For a T1 project, Joybird paid Mills a rate of ███████ per day. For a T2–T4 project, Joybird paid Mills a rate of ███████ per day. The daily rate accounted for the capture, delivery, use and distribution of the photographs on Joybird's websites, social media, and other product advertising materials. | Decl. Werner, ¶ 13. |
| 21. Mills invoiced Joybird for his photography services on a daily or weekly basis following each project, which Joybird paid. | Decl. Werner, ¶ 29, Exh. B. |
| 22. Joybird paid Mills a total of █████ on a project-by-project basis over a period of four (4) years to participate with Joybird's employees to capture Photographs of Joybird's products for the purpose of Joybird using such Photographs on its website, social media and marketing materials. | Decl. Werner, Exh. B. |
| 23. Michelle Metzger ("Metzger") was a Joybird employee who was involved in interviewing, training, and overseeing Mills' execution of Joybird's photography procedures. Metzger has a professional history | Decl. Metzger, ¶¶ 1, 4, 6, 20–21. |

6

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

| | |
|---|---|
| and personal relationship with Mills and suggested that Joybird hire Mills as a freelance photographer. | |
| 24. During initial negotiations, Mills did not discuss or enter into an agreement with Mills regarding copyright ownership or Joybird's permission to use the Photographs with Metzger. | Decl. Metzger, ¶¶ 12–15. |
| 25. During initial negotiations, Mills did not discuss or enter into an agreement with Metzger contingent on hiring Mills as a freelance photographer with any regular schedule. | Decl. Metzger, ¶¶ 12–15. |
| 26. Metzger did not have authority from Joybird to enter into any agreement with Mills on behalf of Joybird. | Decl. Metzger, ¶ 8; Decl. Werner ¶ 11. |
| 27. Metzger indicated to Mills many times that she did not have control over his rate or hiring schedule, which needed to be approved by Joybird employee Erik Werner ("Werner"). Mills knew and acknowledged that Metzger did not have control over his rate or hiring schedule by (i) consistently contacting Werner to discuss project rates and frequency of hire, and (ii) thanking Metzger for her assistance in negotiating with Werner on his behalf, stating on one instance, "[t]hanks for looking out for me though." | Decl. Metzger, ¶¶ 9–11; Exh. 1, pp. 3–8 (highlighting added). |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

| | |
|---|---|
| 28. Werner's responsibilities for Joybird include managing for the logistics of Joybird photoshoots, including hiring photographers and other support staff such as stylists, lighting technicians ("gaffers") and digital technicians ("digitechs"). | Decl. Werner, ¶ 5. |
| 29. Werner has the authority to enter into agreements with freelance photographers and other photoshoot support staff, including dates of hire and scheduling for specific photography projects, the daily rate for each project, and photograph licensing agreements. | Decl. Werner, ¶ 6. |
| 30. Joybird never agreed to a daily rate that was contingent on a frequency of hire. | Decl. Werner, ¶ 17. |
| 31. It is atypical in the industry for freelance photographers to be promised a regular, ongoing, weekly or monthly set volume of work. | Decl. Metzger, ¶ 18; Decl. Werner, ¶ 18. |
| 32. The industry standard for product photographers for retail clients is that the client has the unrestricted right to use the photographs in the business, as they were intended, without further compensation. | Decl. Metzger, ¶ 19; Decl. Wener, ¶ 19. |
| 33. There is no written evidence stating that there were any restrictions on Joybird's use of the Photographs or suggesting that Joybird would | Decl. Metzger, ¶15; |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

2:24-cv-04939-ODW-AGR

| | |
|---|---|
| need a license from Mills to use the Photographs. | Decl. Werner, ¶ 20. |
| 34. Before his first project with Joybird, on January 11, 2019, Mills texts Metzger, "were you able to settle on a rate in the end though?" "And are you still thinking roughly one week per month, possibly 2?" Metzger responds, "[a]t first I would say one week, but it could turn into more" and "[t]he rate is $400 a day." Metzger did not agree that the daily rate was contingent on hiring Mills roughly one week a month. | Decl. Metzger, ¶ 16; Exh. 1, p. 1 (highlighting added). |
| 35. Over 18 months later, on September 25, 2020, Mills texts Werner "[w]ell, [I] do want to talk with you about Joybird rate structures, work frequency, etc., moving forward. This $400/day thing is getting harder and harder for me to justify without some sort of contracted monthly minimum and/or retainer that makes sense. I'm looking to move more and more of my business toward contracts and would love to do the same with Joybird, especially if we are moving toward a one week a month, T1-only model." Mills' comments concerning billing rates was devoid of any suggestion that the rates were contingent on a frequency of hire, or that Joybird's use of the photographs he captured was contingent on a frequency of hire. Joybird did not agree to a regular or monthly frequency of hire. | Decl. Werner, ¶ 23; Exh. 2, p. 1 (highlighting added). |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

2:24-cv-04939-ODW-AGR

| | |
|---|---|
| 36. In an email dated July 12, 2019, Metzger asked Mills if he was available for a series of future T1 assignments, stating, "Erik is interested in booking you three days a week starting in August, what are your thoughts?" Mills responds, in part, "As for the three days a week moving forward, [I']m going to have to put some thought into that. I['] m totally up for locking down a more regular work schedule with Joybird, but for $400/day, I need to continue having total scheduling flexibility like I do now so I don't think that rate for a guaranteed 3 days a week would work out for me," and inquires, "[i]f we were to up my rate to say, $600/day and agreed to three days a week for 3 weeks a month…" Metzger replied on July 15, 2019, "I wanted to send an email about Monday as an official confirmation for the 22nd." Mills did not suggest that he conditioned his rate on a frequency of hire, or that Joybird's ability to use the photographs he captured was contingent on a frequency of hire. | Decl. Metzger, ¶ 17; Exh. 3 (highlighting added). |
| 37. In an email dated September 26, 2019, Mills inquired to Werner about increasing his rates, seeking a daily rate of ▇▇▇▇ for T1 projects, ▇▇▇▇ for T2 projects, and ▇▇▇▇▇▇ for T4 projects. Mills states, "Michelle reached out about my availability for T2's 10/14-24 and [I've] been balking on accepting because of the large block of time at a ▇▇▇ rate…If I were to miss out on [other client's] work, which | Decl. Werner, ¶ 21, Exh. A, p. 2 (highlighting added). |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**
2:24-cv-04939-ODW-AGR

| | |
|---|---|
| pays between $800 and $1500 per day, because of being tied up at Joybird at ▮▮▮ I wouldn't come anywhere near meeting my financial needs for the month, particularly in these months leading up to thanksgiving and Christmas/new years recess." On September 30, 2019, Werner responds maintaining Joybird's set rate of ▮▮▮ for T1 photography projects and agreeing to a slightly increased rate for T2–T4 photography. Mills explicitly agrees to the ▮▮▮ for T1 photographs without a frequency contingency stating, "Im happy to continue billing T1's at ▮▮▮ if/when you need me as it is a welcome filler for me in between jobs at my normal rate." Mills did not suggest that he conditioned his rate on a frequency of hire, or that Joybird's ability to use of the photographs he captured was contingent on a frequency of hire. | |
| 38. Based on Mills' conduct at the time of delivery of the Photographs, Mills did not give any reason for Joybird to believe that Mr. Mills considered Joybird's use and distribution of the Photographs to be limited or conditional. | Decl. Werner, ¶ 31. |
| 39. Through November 2022, while the Photographs were in use, Mills knew that Joybird had set photography rates based on the Tier of project and knew that Joybird used the Photographs Mills captured and delivered | Decl. Werner, ¶ 32. |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

| | |
|---|---|
| on its website social media, and in product advertising materials. For four years, Mills continued to accept Joybird projects without ever stating that: (i) he owned the copyrights in the photographs; (ii) Joybird's use and distribution of the photographs were contingent upon further hiring by Joybird; and/or (iii) his rate for capturing photographs was contingent upon further hiring by Joybird. | |
| 40. Through June 2023, while the photographs were in use, Mills continued to inquire about opportunities to be hired for Joybird's photography projects without objecting to Joybird's use of the photographs. | Decl. Werner, ¶ 33, Exh. 2, pp. 2-5 (highlighting added). |
| 41. Based on Mill's conduct at the time of delivery of the Photographs, Joybird reasonably believed that, to the extent required, Mr. Mills consented to and granted permission for Joybird's unlimited use and distribution of the photographs on its websites, social media, and other product advertising materials. Mr. Mills never provided any reason to believe there was a limit or contingency attached to Joybird's permission. After all, Joybird paid Mills to help create the photographs for that very purpose. | Decl. Werner, ¶ 34. |
| 42. In paying ███████ to Mills in exchange for the capture, delivery, | Decl. Werner, |

| | |
|---|---|
| and unlimited and nonexclusive use of the Photographs, Joybird relied, to the extent it was required, on Mills' implicit permission and incorporated the Photographs on its website and in product advertising materials. Joybird expected to be able to use the Photographs through at least the entirety of each product's lifetime. | ¶ 35. |
| 43. In an email dated June 19, 2023, over 6 months after Joybird stopped hiring Mills, Mills states, "I'm writing to initiate a conversation regarding image licensing for Joybird's current…use of my work on its website and in marketing materials." Mills also states, "[a]s I have explained to Erik and Harrison in our recent discussions, I have been comfortable waiving any licensing fees for this body of work until now because Joybird has been consistent in providing me with regular predictable engagements in what I have considered a balanced long term good faith partnership that has been working for us both. Now, however, it has been many months since I've been contracted, and there is no promise of future work from Joybird." Mills continues, "for my own personal business reasons, I must revisit my licensing terms with Joybird if the company plans to continue using my images or their derivatives moving forward." | Decl. Werner, ¶ 36, Exh. C, p. 5 (highlighting added). |
| 44. In an email dated June 29, 2023, Mills notifies Joybird that July 9, | Decl. Werner, |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

2:24-cv-04939-ODW-AGR

| | |
|---|---|
| 2023 is "the end date for [Joybird's] allowable usage of [his] work." The Photographs at issue were used on Joybird's website, social media, and in product advertising materials at this time. | ¶ 37, Exh. C, pp. 1, 4–5 (highlighting added). |
| 45. After receiving notice of Mills' allegations of a claim for copyright infringement, Joybird decided to remove or replace all Photographs from its website, social media, and marketing materials, just to appease Mr. Mills and avoid the possibility of an unnecessary legal dispute. The replacement efforts were significant, and they included (i) hiring third party photographs to re-shoot the subject furniture, and (ii) replacing the Photographs with photographs captured before his engagement by other photographers. | Decl. Werner, ¶ 38. |
| 46. The costs to replace the photographs was at least ▮▮▮. Not all of Photographs captured by Mr. Mills were used by Joybird in June 2023, and therefore Joybird did not re-shoot the Photographs not in use. Some of the Photographs were replaced with photographs captured before 2019. Joybird would not have removed or replaced the photographs from its websites, social media, and other advertising materials had he not sued for copyright infringement. | Decl. Werner, ¶ 40. |
| 47.    Joybird has incurred costs in defending against Mr. Mill's claims | Decl. Werner, |

14

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

| | |
|---|---|
| for copyright infringement. Joybird would not have incurred these costs had he not sued Joybird for copyright infringement. | ¶ 39. |

**V. Authorship**

| | |
|---|---|
| 48. Joybird has robust procedures for creating photographs of its furniture collections, including specifying all or substantially all creative aspects of the photographs. | Decl. Alpert ¶, 9. |
| 49. Joybird employees selected the subject matter of the Photographs by conceiving of the idea to photograph certain furniture products, without any input from Mills. | Decl. Alpert ¶, 10. |
| 50. Joybird employees located, assembled, and positioned the furniture products on set for each shoot, without any input from Mills. | Decl. Alpert ¶, 11. |
| 51. For T1, T2 and T3 photography projects, photoshoots occurred either at Joybird's photography studio, where Joybird employees designed and built background sets for the Photographs, without any input from Mills. | Decl. Alpert ¶, 12. |
| 52. For T4 photography projects, photoshoots occurred offsite at locations that Joybird employees scouted, approved, and rented, without any input from Mills. | Decl. Alpert ¶, 13. |
| 53. For each photography project Mills was involved in, Joybird employees provided extensive creative input into the final images well before Mills was involved in the process. | Decl. Alpert ¶, 14. |

| | |
|---|---|
| 54. T1 Photographs are stock product images used on Joybird's websites consisting of the subject furniture, or a portion of the subject furniture, on a white background. | Decl. Alpert, ¶15. |
| 55. Before Mills engagement in 2019, Joybird employees developed a "T1 Photography Guideline." This document details the specific shot compositions, angles, and lighting for each type of furniture Joybird manufactures and sells. | Decl. Metzger, ¶ 20; Decl. Alpert, ¶ 16; Exh. 9. |
| 56. The T1 Photography Guideline was provided to Mills who executed T1 images on a project-by-project basis according to the guidelines. | Decl. Metzger, ¶ 20; Decl. Alpert, ¶17; Exh. 4. |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**
2:24-cv-04939-ODW-AGR

57. Because all freelance photographers execute photography according to the T1 Photography Guideline, it is impossible to distinguish which photographer captured the image. For example, shots of the Holt Sofa captured by Mills (left, Holf Sofa in Clearview Ice) and Joybird staff photographer Metzger (right, Holt Sofa in Synergy Pewter) and a third party photographer (Holt Sectional Sofa in Faithful Olive) are identical except for the selection of subject furniture, which Joybird employees selected.

Decl. Alpert, ¶ 18, Exh. B, Exh. C.





58. Mills admits that Joybird made these creative contributions, stating

Decl. Werner,

---

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**
2:24-cv-04939-ODW-AGR

| | |
|---|---|
| in an email that for T1 Photographs, the freelance photographer only "essentially follow[s] a specific angle and lighting requirements where consistency is paramount, but still ha[s] to be flexible and experienced enough to make targeted lighting adjustments and judgements on camera quality compromises when certain corrections are more efficiently made in post." | ¶ 22, Exh. A, p. 2 (highlighting added). |
| 59. As the T1 Photography Guideline became more robust over time, it provided additional details such as where to place the camera, whether the camera was to be positioned horizontally or vertically, specified details including focal distance, lens type, and aperture settings, and provided specifications to crop the image. | Decl. Alpert, ¶ 19, Exh. D. |
| 60. For T1 Photography projects, Mills made minor adjustments to the camera and lighting and physically triggered the shutter for these Photographs. | Decl. Alpert, ¶ 20. |
| 61. Tier 2 images were also product images that were taken in-studio at Joybird facilities. T2 Photographs have limited staging, include a more comprehensive set design and feature additional props. | Decl. Alpert, ¶ 21. |
| 62. Joybird employees selected the subject matter of the T2 photographs and created the composition of the photograph by conceiving and directing furniture arrangement, prop selection, photograph angle, | Decl. Alpert, ¶22-23; Exh. 5; Exh. 6. |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**
2:24-cv-04939-ODW-AGR

| | |
|---|---|
| lighting, and overall aesthetic appeal of the photograph. | |
| 63. Joybird employees developed a "T2 Photography Guideline" for each T2 photoshoot. These documents included, for example, 3D renderings of the photoshoot set and furniture placement, and the camera angles and lighting specifications for each subject furniture Joybird selected. | Decl. Alpert, ¶ 24, Exhs. E-G, I, K-N. |
| 64. A T2 Photography Guideline was provided to Mills for T2 projects he was involved in. | Decl. Alpert, ¶ 25. |
| 65. Mills executed the T2 images according to the provided guidelines. | Decl. Alpert, ¶ 26. |
| 66. During T2 photoshoots, Mills made minor adjustments to the furniture and props (e.g., adjusted a prop if it impeded the camera angle), and physically triggered the shutter. | Decl. Alpert, ¶ 27. |
| 67. T3 and T4 Photographs are elevated product images. T3 Photographs are taken at the Joybird studio while T4 Photographs are taken at offsite locations. Joybird searches for and books the offsite locations. | Decl. Alpert, ¶ 28. |
| 68. Joybird employees developed a "Creative Brief" and/or "Mood Board" for each T3 and T4 photoshoot. These documents include the subject furniture and props and conceive the look and feel of the photoshoot. | Decl. Alpert, ¶ 29, Exhs. I, L, N-S. |
| 69. For each T3 and T4 Photography project, a Creative Brief and/or | Decl. Alpert, ¶ |

19

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

| | |
|---|---|
| Mood Board was provided to Mills. Mills attended pre-production meetings with Joybird employees, lighting technicians, stylists, and assistants to receive Joybird's direction on the photoshoot. Mills executed the images according to the look and feel set by Joybird. | 30. |
| 70. Creative contributions by Joybird employees to the T3 and T4 Photographs included: (i) selecting the subject furniture, props and background; (ii) locating and delivering the subject furniture; (iii) booking third party venues to host photoshoots (if applicable); (iv) providing a Creative Brief and/or Mood Board to direct the lighting and overall aesthetic of the photograph; and (v) directing lighting, furniture placement, and camera placement during the photoshoot. | Decl. Alpert, ¶ 31. |
| 71. Mills had more autonomy to position the furniture and select the angles and lighting in T3 and T4 Photographs as compared to T1 and T2 Photographs. | Decl. Alpert, ¶ 32. |
| 72. Joybird controlled the entire development and creation of the Photographs. Joybird employees conceived of the ideas for the Photographs, selected the subject matter, background settings and props (for T2-T4 Photographs), located and delivered subject furniture, obtained agreements and paid for use third party shooting locations, arranged the composition for each shot, and directed Mills to make | Decl. Alpert, ¶ 33. |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**
2:24-cv-04939-ODW-AGR

| | |
|---|---|
| changes to the camera angles and lighting. | |
| 73.    Harrison Alpert is an employee of Joybird having the title of Creative Director. The role of the Creative Director is to conceptualize, inspire and direct entire photography productions. | Decl.    Alpert, ¶¶ 4-5. |
| 74. At all times, the Creative Director had final approval of the positioning of the subject matter and camera angle and lighting of the Photographs. | Decl. Alpert, ¶ 34. |
| 75. At all times, the Creative Director had final direction and approval of the editing and selection of the Photographs. | Decl. Alpert, ¶ 35. |
| 76. Mills sought out and deferred to Joybird employee's judgment regarding the positioning of the subject furniture and props, camera angles, and lighting. | Decl. Alpert ¶ 36, Exh. T. |

Date: July 14, 2025                    Respectfully Submitted By:


/s/ Glenn E. Forbis
Glenn E. Forbis (admitted Pro Hac Vice)
J. Bradley Luchsinger (admitted Pro Hac Vice)
Colette E. Verch (admitted Pro Hac Vice)
Harness, Dickey & Pierce PLC
5445 Corporate Drive, Suite 200
Troy, MI  48098
248-641-1600
Email: gforbis@harnessip.com
bluchsinger@harnessip.com

21

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

rsiminski@harnessip.com

*Of Counsel for Defendant*
*STITCH INDUSTRIES, INC., d/b/a*
*JOYBIRD, a Delaware Corporation*

Edward W. Lukas, Jr.
Harrington, Foxx, Dubrow & Canter, LLP
535 N. Brand Boulevard, Suite 800
Glendale, CA 91203
(213) 489-3222 x227 (phone)
(424) 354-1853 (Direct Line)
(213) 622-4321 (fax)
Email: elukas@hfdclaw.com

*Local Counsel for Defendant*
*STITCH INDUSTRIES, INC., d/b/a*
*JOYBIRD, a Delaware Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 14, 2025, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will be served by operation of the Court's electronic filing system upon all counsel of record and ECF participants.

<u>/s/ Glenn E. Forbis</u>
Glenn E. Forbis